1-5-1-1-9-4 United States v. Joshua Gonsalves, and 1-5-1-8-3-8 United States v. Stanley Gonsalves. Good morning. There were no probable cause for the search of Joshua Gonsalves and his car as he was traveling back home to Cape Cod when the officers ordered and proceeded with the search. The most that they had, there was a reliable twice-before informer that made the tip, a confidential informer did make the tip, but there was no indication of the basis of fact that she relied on, there was no indication of her personal knowledge, and some of the circumstances that she reported were determined to be unreliable, at least some indicia of unreliability in terms of what was observed. In addition, there was no corroboration of this tip by the police officers who followed Mr. Gonsalves, nor was there any corroboration after they stopped Mr. Gonsalves. The only thing that the stop, he perfectly complied, immediately stopped, gave his name, address, was asked out of the car, and they proceeded following that to commence the search of the car and the search of Mr. Gonsalves. So our argument is basically that there is no probable cause for the search that occurred, despite the fact that this one cooperating witness had twice before been reliable. What was found... But she had also purchased drugs from them. I'm sorry, just... She had also made a purchase... That was one of the reliabilities that she had in the past, was a controlled buy about a month before from Mr. Gonsalves and Caitlin Schell. What's the kind of thing that's missing from her account that you would be looking for to satisfy yourself that she would be an effective tipster? I think it's not only what was missing, which was sort of the personal knowledge that she didn't indicate she had about that trip, but also what she was wrong about. She was wrong about the destination, not by far, but she said New Bedford, it was a Kushner. She was wrong about the parties that were leaving. It was Joshua Gonsalves and Caitlin Schell. Instead, there were those two plus another person, another woman that went along with them. If you have personal knowledge of his drug dealing, which she did claim to have, in the sense that she was involved in the transaction with him, and she's given prior information that checked out, and now she's giving a detailed account of his involvement in yet another drug transaction. I mean, that seems pretty good. I think what's missing is probable cause to believe that on that evening, there were drugs, 2,000 pills in that car. In fact, there weren't, but that was after the fact. Yeah, but you've left out that the officers did surveillance first. They did. And they followed the car to a residence in a Kushner, where they watched what they thought was an exchange of oxycodone pills, or at least a drug transaction. No, ma'am, they did not. They did not observe any transaction. They only observed them go into the building and later come out. He pulled up next to a white Infiniti that was identified as belonging to a suspected oxycodone dealer. That is correct. That's the only thing that they corroborated was the identification of the vehicle at that location. They stopped the car ostensibly because it's speeding, although they say they would have stopped it anyway, because they suspected that they would find drugs, that this was part of a drug trafficking organization. That's correct. However, what occurred... That plus the informant is not enough? Oh, no, Your Honor, I don't think so. He was going slightly over the speed limit, but they were searching for drugs, and that's immediately what they did. And they see a woman get out of the car and she throws away a bag. No, Your Honor. How long is that after they've stopped the car? That was at least 20 minutes later after they had searched the vehicle, including the trunk and Mr. Gonsalves, and found a number of articles. There was a stipulation that it was at least 20 minutes. The testimony at trial indicated it was more like 30 to 45. In the CIA's account, was the white Infiniti or the suspected drug dealer who's connected to that white Infiniti mentioned? The informant mentioned the name of John Doe number four that was going to be met. And that is, in fact, the car is tied to that person? The car was tied to that person. So you have a CI who's got personal knowledge of the drug dealing, who's given other accounts of transactions that checked out, one other that checked out, I guess, and now says here's what's going to happen next. They follow it, and so far, up until the point of meeting with the person who's claimed to be the drug dealer, that's checked out, too, and that's not enough? Well, I don't think it did, Your Honor. First of all, her initial tip was that it was two days earlier they were making the trip. That changed. But then when they left the house, there was an additional person along that wasn't reported. She didn't report that he would go alone? No, with Caitlin Cho, his girlfriend. Yeah. They'd live with him. What I'm saying is that that's not inconsistent with the CI's report. It's not inconsistent. It's an indicia of unreliability. Why? Because she was wrong about the parties that were going to be traveling. Did she say he would be going alone? No. Or did she say it would be with a different person? She said it would be Joshua Goncalves and Caitlin Cho only, Your Honor. Did she say only? Only. She mentioned the two were leaving. She did not mention a third person. Then the two were there. The two were there. So why isn't it an indicia of reliability? Because she never said there wouldn't be a third. The call was made moments before they left. Not to mention the third person that was along I think indicates some reliability just as the location they traveled to indicates some unreliability. And the probable cause, I believe, has to go to the location of his drugs that day in that car. I'm sorry. They didn't need probable cause to stop the car. They needed reasonable suspicion. That is correct. From their point of view, they had it. They stopped the car and they arranged for a drug-sniffing dog to be brought to the scene. Before then, the woman gets out of the car and tosses the pills, which are oxycodone, is it? That's right. And the district court concludes that by the time they actually do the drug-sniff and the search, there's probable cause. So what's wrong with that? There was no, well, I think the facts are what's wrong with that. There was no reasonable suspicion. If there was, they didn't act on a search for weapons. They did a thorough search, took 20 minutes to search the car, including the trunk and Mr. Gonsalves, had the parties out on either side, and it took that long when they announced, well, now we're going for a dog before that toss took place. Okay. So your case really turns on the reasonable suspicion for the stop to begin with and what you say was the unreliability of the confidential informant. I think not. I think reasonable suspicion. Well, once the woman gets out of the car with drugs and tosses it, doesn't that elevate the amount of suspicion there's something wrong here? I think there was. It took 20 minutes at a minimum before she tossed those drugs. The search took place before that. It was the announcement 20 minutes later that we're going to go get a dog now that caused her, apparently, to toss those drugs aside. So it was the idea that they extended the search to, extended the detention too long? You didn't have reasonable suspicion to hold for those additional 20 minutes? Absolutely not. No reasonable suspicion to hold them for 20 minutes, nor was there a limited search for weapons. Okay. May it please the Court, I'm Joshua Gordner. I represent Stanley Gonsalves, the brother of the other co-defendant. To break a chain, I'm going to talk about drug quantity calculations and not search and seizure. The drug quantity calculation matters in this case because the guidelines calculation creates a marker. And if the calculation of the district court said, I'm not sentencing based on the guideline calculation. Correct. So why is that an issue in front of us? Well, it creates a marker as to what the amount of. We have lots of case laws saying when the district court says it's not relying on the guidelines calculation, we believe the district court. We've already rejected that marker theory. Yes, Your Honor. The court overstated the drug quantity in several significant ways. The charge conduct here was only for one type of contraband, for oxycodone, not any other type of drug. But some of the pills were self-made out of heroin and didn't contain any oxycodone. And similarly, forfeiture was for the proceeds of just the oxycodone crimes, not other drugs. But Stanley Gonsalves had income streams that, legal or not, were separate from the charged contraband. Also, the court assumed 30 milligram pills, and demonstrably, some of them were 15 milligrams. The court used a price in its calculation, a price of $20 a pill, and the street value of these drugs was $30, thereby increasing the calculated number of pills. Finally, as the court knows, this case grew out of another drug conspiracy where a man named John Willis was importing drugs from Florida to Massachusetts. And Stanley Gonsalves, my client, had an arrangement where he was buying those supplies to distribute them in Cape Cod. But Willis's team of carriers were supplying other distributors in addition to Stanley Gonsalves, and some pills disappeared en route. Some pills were destined for other distribution networks, not Stanley Gonsalves. And so relying on the carrier's testimony and their estimates of quantity, even if the judge admittedly did take the minimum of those, but relying on them at all, overstates the number of pills that Stanley's distribution network could be responsible for. And working back, as the court did from the forfeiture verdict, overstates the amount of pills derived from the charged conduct. And so overall, the court overstated the drug quantity for sentencing. If no questions, I'll call. Thank you. Your Honors, may it please the Court, Ringo Graham on behalf of the government. Just to address first the question of Joshua's argument about the stop, the government's position is, in fact, that there was probable cause at the time of the stop, but certainly reasonable suspicion. And I think Your Honors are very well aware of the facts. I won't recite them all, but as set forth in the affidavit in the district court's opinion, there was actually a wealth of information connecting Joshua Gordon to drug dealing and Caitlin Shaw, not just the information from two confidential sources actually purchased from him, but other information growing out of the Willis investigation recited in the affidavit showing that he was, in fact, a large-scale Oxycodone dealer. So that was sort of well-established background information. Then you have the two controlled purchases, one in the very month that the stop occurred, and then the testimony of the information from what turned out to be, I think, Crystal Flurry of the CS1, which recites specifically that she provided information on two other trips that had been made, one that correctly identified a person going off Cape to purchase drugs, resulting in the seizure of $69,000. So she'd been clearly shown to be reliable specifically with knowing when trips are going to be made and identifying where they would be headed and where they could be found. Twice before this stop, she'd identified particular trips. They'd been surveilled and followed, and the officers had found that they checked out with what she said. So when she says the third time, I think another trip is going to happen, they certainly can follow that information. And then, as Your Honor has pointed out, the surveillance did check that out once again, placing the car in proximity to the car of a known dealer. And, again, that's not just by this particular CS1, but CS2 had identified that car and that person as being the primary source of supply. So there's plenty of information at that time. So then the question comes in, again, in government's view, this is in excess of the information found to constitute probable cause in this court's recent decision in white. And thus, in some sense, you can bypass a lot of what follows by simply saying they could have conducted the search from the outset based on the information they had. But if there's any question, it's certainly that the district court, following its reasoning, the suspicion escalated as events unfolded, including the discovery of a large wad of cash in Joshua's pocket, and his lack of registration. There was additional suspicious events that resulted in, justified the length of time. It took approximately 20 minutes before the drugs were thrown and found, at which point I think it's clear that there was probable cause for what follows. Turning, again, just briefly to the question of sentencing, because I think that this is clearly not really before the court in light of what the district court said, that it wasn't relying on the calculations. We do argue that none of the arguments have merit individually. Also bears note, one point we didn't make in our brief, because there's many arguments against the sentencing challenge, is that, in fact, he asked for a quantity of, in his sentencing memorandum, a quantity of pills that would have resulted in exactly the same GSR relied upon by the district court, 171,000 pills. That would have resulted in not just slightly lower, but exactly the same one that was relied upon. So arguably it's weighed entirely. But certainly there's no, in light of the information we have about the district court's own statement, that it wasn't relying on the GSR. There's no argument that follows from this. If there aren't any further questions, we'll end the brief. Thank you. You're on. I'm sure it was an error, but Mr. Crom said Joshua Gordon would be on. Thank you very much. Thank you.